SCREENING MEMORANDUM

THIS OPINION HAS NO PRECEDENTIAL
VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Sue B. Brigman,       
Appellant,
 
 
 

v.

 
 
 
Johnny M. Brigman, Laverne Brigman, Ray
Brigman, Percy W. Brigman, Flora 
 Ann Johnson, Katherine Cassidy, Roberta Holmerod, Janice Sakala and Jodie
Bethea,        Respondents.
Sue B. Brigman, Special Administrator of the Estate of
W.A. Brigman, 
 Jr.,        Appellant,
 
 
 

v.

 
 
 
Johnny M. Brigman,       
Respondent.
 
 
 

Appeal From Marlboro County
C. Anthony Harris, Circuit Court Judge

Unpublished Opinion No. 2004-UP-323
Submitted March 19, 2004  Filed May 
 14, 2004

AFFIRMED

 
 
 
Charles J. Hupfer, Jr., 
 John R. Chase and Benjamin T. Zeigler, all of Florence, for Appellant.
Florence Ann Johnson, of 
 Lexington;  Janice Sakala, of Beaverton, Oregon;  Jodie Bethea and Roberta Holmerud, 
 both of Bonita, California;  Katherine Casside, Laverne Brigman, Ray Brigman 
 and Percy W. Brigman, all of Latta, and Ralph L. Kelly, of Bennetsville, for 
 Respondents.
 
 
 

PER CURIAM: Sue Brigman appeals the ruling 
 of a special referee denying probate of the will of W.A. Brigman, her husband. 
 We affirm.
 
 FACTS
W. A. Brigman, Jr. (Testator) and Sue 
 B. Brigman (Appellant) were married in 1973. They lived on a farm in Marlboro 
 County, where Testator was a life-long farmer. The land and the farm had been 
 in the Brigman family for as many as 150 years. Testator executed a will in 
 1994, leaving Appellant a life estate (or until she remarried) in the farm and 
 the remainder to his nephew Johnny Brigman (Respondent) in fee simple. Testator 
 died on April 26, 1999. (R.30). 
Following Testators death, a will dated April 23, 1999 
 was offered for probate. That will left the farm and all of the farming equipment 
 to Appellant in fee simple. Respondent challenged the validity of the 1999 will. 
 The case was referred to a special referee in June 2001 and a hearing was held 
 on July 13 of that year.  
At the hearing, Kelly Childers, 
 [1] the Brigmans minister, and Nannie Williams, a health care worker, 
 testified for Appellant. They were the subscribing witnesses for the 1999 will. 
 According to them, Testator was alert and could speak on April 23, the date 
 of the wills execution. The two wills were allegedly read to Testator numerous 
 times and he was asked repeatedly if he understood and wanted the changes being 
 made. Each time, Testator said yes or nodded his head in agreement. Reverend 
 Childers testified Appellants hand was up against the back of [Testators] 
 hand to aid and give assistance when the will was executed. Childers and Williams 
 testified that along with Appellant, Appellants daughter and grand-daughter 
 were also in the home on that evening. [2] Appellant, her daughter, and 
 her grand-daughter did not testify at the hearing. 
Laverne Brigman, Respondents brother, also testified. 
 He claimed that he heard Testator say that Testator was going to make some 
 changes on April 6, while Testator was in the hospital. Laverne Brigman also 
 testified that Testator was upset with Respondent because Respondent had brought 
 some farm papers to the hospital for Testator to sign. [3] 
Respondent testified on his own behalf. He claimed 
 that he visited Testator daily, except for April 10, when Appellant refused 
 him entry into the house. Respondent also said that he saw Testator on April 
 23, late in the after-noon. Testator was by then just breathing . . . [h]is 
 eyes were set, he did not speak, he did not move, he did not talk, he did not 
 know [Respondent]. Respondent maintained that Testator had been in that condition 
 since April 11 until his death on April 26. Respondents son Johnny Brigman 
 also took the witness stand. He corroborated his fathers testimony that Appellant 
 had barred the two of them from visiting Testator on April 10. 
Another family member testified that Testator was 
 in mighty bad shape in the days preceding his death. Testator really didnt 
 seem to be aware of what was going on and asked about a relative who had been 
 dead a pretty good while. There was also testimony from Annie Anderson. She 
 was a neighbor, a long-term friend of Testators family, and a retired registered 
 nurse. When she visited Testator in the after-noon of April 23, [his] eyes 
 were . . . glazed over and [h]e had no expression. 
By an order of October 15, 2003, the special referee 
 found that W. A. Brigman, Jr. was subjected to undue influence or duress to 
 execute the document offered for Probate as the Will of W. A. Brigman, Jr. dated 
 April 23, 1999. He also found that Testator lacked any testamentary intent 
 and testamentary capacity. He denied probate. 
ISSUES

 
 Did the special referee err in finding that Testator
 was under undue influence or duress?
 
 
 Did the special referee err in finding that Testator
 lacked testamentary intent?
 
 
 Did the special referee err in finding that Testator
 lacked testamentary capacity? 

STANDARD OF REVIEW
The standard of review applicable to cases 
 originating in the probate court is controlled by whether the underlying cause 
 of action is at law or in equity. In re Thames, 344 S.C. 564, 568, 544 
 S.E.2d 854, 856 (Ct. App. 2001).  An action to determine the validity of a will 
 is one at law. In re Estate of Weeks, 329 S.C. 251, 262, 495 S.E.2d 454, 
 460 (Ct. App. 1997). If the proceeding in the probate court is in the nature 
 of an action at law, the [appellate] court may not disturb the probate courts 
 findings of fact unless a review of the record discloses there is no evidence 
 to support them. Macaulay v. Wachovia Bank of South Carolina, 
 N.A., 569 S.E.2d 371 (Ct. App. 2002) (citing Howard 
 v. Mutz, 315 S.C. 356, 361, 434 S.E.2d 254, 257 (1993)). Contestants of 
 a will have the burden of establishing undue influence, fraud, duress, mistake, 
 revocation, or lack of testamentary intent or capacity. S.C. Code Ann. § 62-3-407 
 (Supp. 1996). The contestant must do so by clear and convincing evidence. Russell 
 v. Wachovia Bank, N.A., 353 S.C. 208, 217, 578 S.E.2d 329, 333 (2003).
ANALYSIS
Appellant argues that the special referee erred when 
 he found that Testator executed the 1999 will under undue influence or duress. 
 We disagree.
For a will to be invalidated for undue influence, the influence 
 must be the kind of mental coercion which destroys the free agency of the creator 
 and constrains him to do things which are against his free will, and that he 
 would not have done if he had been left to his own judgment and volition. Id. 
 The evidence must show that the free will of the testator was taken over by 
 someone acting on testator's behalf. Id. In general, there should be 
 evidence either of threats, force, and/or restricted visitation, or of an existing 
 fiduciary relationship. Id. 
Here, Testator had been in very poor health since April 7, 
 when he suffered a second or third stroke. He was also recuperating from a heart 
 attack and was suffering from kidney failure. Testator was going down hill 
 fast. The record does not indicate that Testator ever requested a change in 
 the 1994 will at all. It was Appellant who spearheaded the execution of the 
 1999 will, aiding Testator to sign the will, choosing the subscribing witnesses, 
 telling them when to come.   Reverend Childers, who testified for Appellant, 
 admitted that, on the night in question, Testator could not sign and [Appellant] 
 took his hand and guided it to place his signature on the will. When asked 
 whether Testator had indicated he wanted or needed assistance, Reverend Childers 
 answered he didnt ask her to [help him sign], if thats what youre asking 
 me. Compare S.C. Code Ann. § 62-2-502 (1976) ([E]very will, shall be 
 in writing signed by the testator or in the testator's name by some other person 
 in the testator's presence and by his direction, and shall be signed 
 by at least two persons each of whom witnessed either the signing or the testator's 
 acknowledgment of the signature or of the will.) (emphasis added). 
The special referee also noted that the persons surrounding 
 Testator that night, namely Appellant, Reverend Childers, Appellants daughter 
 and grand-daughter, and the health care worker, testified to reading the 1999 
 will three or four times to him. They did this at a time when Testator was full 
 of poison, not having yet received his nightly dialysis treatment. While there 
 is no evidence of threats, witnesses testified that Appellant precluded them 
 from visiting Testator on at least one occasion. Moreover, Appellant was heard 
 saying I changed his will.
Clearly, there was some evidence to indicate that Testator 
 had been coerced. Therefore, we cannot say that the special referee erred as 
 a matter of law in finding that Testator was under duress or undue influence.
Appellant also argues that the special referee erred in finding 
 that Testator had no testamentary intent or capacity. Again, we disagree.
In general, a testator has the capacity to make a will if 
 he knows (1) his estate, (2) the objects of his affection, and (3) to whom he 
 wishes to bequeath his property. In re Weeks, 329 S.C. at 263, 495 S.E.2d 
 at 461. And a testator who signs a will is presumed to understand its nature 
 and content. Henkel v. Winn, 346 S.C. 14, 18, 550 S.E.2d 577, 579 (Ct. 
 App. 2001).  As said earlier, it up to the party challenging the will to show 
 the contrary. § 62-3-407.
At the hearing, there was testimony that Testator, starting 
 around April 11, did not respond to or recognize family members, that he was 
 unaware of his surroundings, that his eyes were set and glazed. On the specific 
 day that the 1999 will was executed, Testator had at least two visitors, Respondent 
 and Annie Anderson. They both testified that when they saw Testator in the after-noon, 
 he was non-responsive, gone. The subscribing witnesses offered a different 
 account. They testified that Testator was alert when the will was signed late 
 at night on April 23, that Appellant was told about the changes and approved 
 them. The special referee again found, however, that the will was signed when 
 Testator was in need of his dialysis treatment. We cannot say that the conclusion 
 was legal error. 
The special referee saw and considered all of the testimony. 
 He noted, as do we, that neither Appellant nor her daughter testified. Both 
 had played key roles in the signing of the 1999 will. The special referee also 
 noted that the farm had been in Testators family for numerous generations and 
 that Testator had been preoccupied with its long-term care. Respondent had spent 
 much time on the farm, both as a boy and as an adult; he had been like a son 
 to Testator. Testator had already told Respondent that the farm was coming 
 to [him]. Additionally, the special referee took into account Testators reputation. 
 Testator had always been steady and stable, not one to act on a whim . . 
 . when he wasnt in full control of his faculties. 
The special referee could have discounted the testimony offered 
 by Respondent and Annie Anderson that Testator was already gone in the after-noon 
 of April 23, 1999. In the alternative, he could have found that Testator regained 
 alertness that evening  just long enough to change his will and leave the family 
 farm to Appellant. He did neither. Instead, having seen and evaluated all of 
 the witnesses, the special referee discounted the testimony of Appellants witnesses 
 and set aside the 1999 will. [4] As the record provides some evidence for his 
 findings, we cannot say that he erred. Therefore, we affirm his ruling.
CONCLUSION
Based on the foregoing, the decision of the special 
 referee is 
AFFIRMED.
GOOLSBY, HOWARD, and BEATTY, JJ, concur.

 
 [1] Childers married Appellant less than one month 
 before the probate hearing. 

 
 [2] Appellant had children from a previous marriage, 
 but none with Testator.

 
 
 [3] Testator apparently signed a power of attorney over to Respondent 
 on April 6, but it was rescinded the next day. Another power of attorney was 
 signed on April 10 in favor of Appellant and of Gary Crawford. Gary Crawford 
 was a friend of Appellants daughter. Appellant used that power of attorney 
 to withdraw funds from Testators banking accounts that same day. 

 
 [4] See Sauers v. Poulin Bros. Homes, 
 Inc., 328 S.C. 601, 605, 493 S.E.2d 503, 505 (Ct. App. 1997) 
 (holding that a finder of fact is free to disregard a witnesss testimony, 
 even if uncontradicted) (citation omitted).